1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**KAZEROUNI LAW GROUP, APC**
Yana A. Hart, Esq. (SBN: 306499)
yana@kazlg.com
2221 Camino Del Rio, Suite 101
San Diego, CA 92108
Telephone: (619) 233-7770
Facsimile:  (619) 297-1022

*Attorneys for Plaintiff*
Maria Silva

**KAZEROUNI LAW GROUP, APC**
**2221 CAMINO DEL RIO SOUTH, SUITE 101**
**SAN DIEGO, CA 92108**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Maria Silva**, | **Case No:** '19CV2313 BAS JLB |
| Plaintiff, | **Complaints for Violations of:** |
| v. | (1) **The Truth in Lending Act, 15 U.S.C. §1601, *et seq.*;** |
| **Ygrene Energy Fund, Inc., Sun Coast Remodelers, and Clearview Home Improvements Inc. dba Clearview Home Energy Solutions,** | (2) **The Home Ownership Equity Protection Act, 15 U.S.C. § 1639;** |
| Defendants. | (3) **The Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §1788, *et seq.*;** |
| | (4) **Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*;** |
| | (5) **California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200; and** |
| | (6) **Fraud** |
| | **JURY TRIAL DEMANDED** |

1
2

**INTRODUCTION**

3   1. Maria Silva ("Ms. Silva" or "Plaintiff") brings this Complaint against Ygrene
4   Energy Fund Inc. ("Ygrene"), Sun Coast Remodelers ("SCR"), and Clearview
5   Home Improvements Inc. dba Clearview Home Energy Solutions
6   ("Clearview") (Collectively referred to as "Defendants") for violations of: (1)
7   the Truth in Lending Act, 15 U.S.C. §1601, *et seq.* ("TILA"); (2) the Home
8   Ownership Equity Protection Act, 15 U.S.C. § 1639 ("HOEPA"); (3) the
9   Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §1788, *et seq.*
10   (the "Rosenthal Act"); (4) Consumer Legal Remedies Act, Cal. Civ. Code §
11   1750, *et seq.* ("CLRA"); (5) California's Unfair Competition Law, Cal. Bus.
12   and Prof. Code §17200 ("UCL"); and (6) Fraud.

13   2. Through its Streets and Highways Code,[1] the State of California has authorized
14   property owners to enter into voluntary contractual assessments with pre-
15   approved organizations to finance the installation of permanent, clean-energy
16   or energy-efficient improvements on real property.

17   3. This energy-efficient home improvement financing is called Property Assessed
18   Clean Energy ("PACE") financing.

19   4. PACE financing programs gained popularity during the Obama administration.
20   First started in 2008, municipal governments established PACE financing
21   districts to allow homeowners to repay privately financed loans through a
22   special tax assessment on their property tax bills. PACE loans in California
23   cover items such as solar panels, low-flow toilets that save water, or in this
24   case, a "high efficient" heating, ventilation, and air conditioning ("HVAC")
25   system and various door and window replacements.

26

27   [1] Chapter 29 Part 3 of Division 7 of California's Streets and Highways Code
authorizes legislative bodies to approve Property Assessed Clean Energy Programs.
28   [2] Recent legislation has developed to combat and prevent future exploitation of

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

5.  Defendants in the instant action use California's PACE legislation to defraud California homeowners and acquire first-priority tax liens on real property.

6.  Defendant Ygrene is a pre-approved PACE financing organization purporting to finance homeowners for clean energy or energy-efficient home improvements.

7.  Ygrene provides a platform and uses contractors to solicit loans and complete home improvement services. Indeed, PACE programs are designed to use home improvement contractors as the salespeople for the loan product. Marketing for eligible upgrades is typically done by contractors through door-to-door salespersons, up-selling from other repairs, advertisements and telemarketers.

8.  Without properly screening and monitoring its network of contractors and encouraging predatory lending and aggressive marketing, contractors who serve as de-facto mortgage brokers too often misrepresent how the financing works, sticking people with loans they can neither understand nor afford.

9.  In fact, contractors serve as a homeowner's "primary" source of information about the loans. Ygrene does not tell contractors they need to determine if customers can afford the loan, and Ygrene rubber-stamps payments to contractors, without regard to whether the contractors followed applicable guidelines and laws.

10. Unlike traditional home improvement financing, PACE financing creates a loan in the form of a voluntary special assessment or special property tax. Homeowners must pay these special assessments when paying their property taxes to the county tax collector. The money collected is then disbursed back to the pre-approved creditor who originally lent the money to homeowners.

11. Assessments resulting from PACE financing ("PACE Assessments") attach to homeowners' properties as a tax lien, which are prioritized over other debts, like mortgages, on the property.

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

12. As a priority tax lien, PACE Assessments inhibit the marketability of real property, prohibiting potential buyers from securing purchase money from mortgage industry participants, such as the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation.

13. Through this financing program, Ygrene can obtain priority over all existing mortgages and lien-holders on a homeowner's property.

14. Further, because PACE financing is a tax assessment, Ygrene is able to shift the burden of collecting payments to the county tax assessor.

15. Borrowers then become at risk of losing their homes because the loans place liens on their house, lack adequate consumer protections, and are marketed and sold by unscrupulous or self-serving contractors who are not properly monitored.

16. When soliciting to homeowners, Ygrene and its contractors do not adhere to requisite consumer protection disclosures and procedures.

17. Because Defendants bear little risk, they specifically defraud vulnerable, low-income homeowners, such as elderly individuals, who will sign PACE Assessment contracts without knowing the true cost of their home improvements.

18. Defendants use the guise of "tax assessments" to gain home improvement mortgage liens and believe this semantic ruse allows them to skirt restrictions set by consumer protection laws, such as the Truth in Lending Act and Home Ownership Equity Protection Act.

19. Indeed, throughout the history of PACE funding, programs like Defendants' have distributed unaffordable home loans to low-income homeowners who have fixed incomes and little ability to pay.

20. Because the PACE funding creditors obtain a priority lien on the consumer's home, one which pits itself ahead of other mortgage holders, PACE lenders have an incentive to make home-secured loans that are likely to default.

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

21. Specifically, Defendants have consistently targeted and solicited to senior or disabled homeowners, seeking to take advantage of their vulnerability, susceptibility to persuasion, susceptibility to pressuring sales tactics, and inability to comprehend or even review the documents provided in electronic versions.

22. Recent legislation has developed to combat and prevent future exploitation of consumers. In 2017, California Governor Jerry Brown signed two bills to better ensure consumer protections for borrowers taking out PACE loans. The bills became effective in 2018. These bills enshrine a number of reforms into law, including a first-time requirement that a borrower's income be factored into underwriting. The legislation also bars kickbacks and establishes a minimum training requirement for contractors, who typically act as salespeople.

23. Ms. Silva, through her attorneys, brings this action to challenge the conduct of Defendnats in response to Defendants' fraudulent and abusive conduct towards Ms. Silva.

24. Ms. Silva makes these allegations on information and belief, except allegations that pertain to Ms. Silva, which she alleges on personal knowledge.

25. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

26. Unless otherwise stated, all of Defendants' conduct occurred within California.

27. All of Defendants' violations were knowing, willful, and intentional, and Defendants did not maintain procedures reasonably adapted to avoid these violations.

## JURISDICTION & VENUE

28. Original subject matter jurisdiction is valid in this U.S. District Court for violations of TILA and HOEPA pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction for Plaintiff's state claims pursuant to 28 U.S.C. § 1367.

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

29. This Court has personal jurisdiction because Defendants are California companies that, at all times relevant, regularly conducted business in the State of California.

30. Venue is proper pursuant to 28 U.S.C. 15 U.S.C. § 1391(b) because Defendants, at all times herein mentioned, were doing business in the County of San Diego, State of California. Further, venue is proper in this district because Plaintiff resided in this district at all times herein mentioned such that a substantial part of the events giving rise to the claims occurred in this district.

31. Venue is also proper in U.S. District Court, Southern District of California, pursuant to 28 U.S.C. § 1391(b) because Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction at the time the action is commenced, and Defendants' contacts with this District are sufficient to subject them to personal jurisdiction.

## PARTIES & DEFINITIONS

32. Ms. Silva is a natural person and disabled citizen residing in the County of San Diego, State of California.

33. As discussed below, Ms. Silva was deceived into accepting PACE financing for home improvements without knowing how such financing would affect her taxes. As a result, Ms. Silva was involved in a transaction with a party offering or extending credit of the purpose of home improvement. Ms. Silva is therefore a "consumer" under 15 U.S.C. §1602(i) and a "debtor" under Cal. Civ. Code § 1788.2(h).

34. Defendant, Ygrene, is a California limited liability company, headquartered in Petaluma, California. Through its PACE financing program, Ygrene, in connection with services, regularly extends consumer credit which is payable through an agreement in more than four installments for which a finance charge is imposed. Therefore, Ygrene is a "creditor" under 15 U.S.C. §1602(g).

35. Defendant Ygrene also charges interest rates for providing PACE financing services and collects them through consumer tax payments. Therefore Ygrene, in the ordinary course of business, regularly, on behalf of itself, or others, engages in debt collection as that term is defined by California Civil Code § 1788.2(b), and is therefore a debt collector as defined in California Civil Code § 1788.2(c) and a "person" as defined by Cal. Civ. Code § 1788.2(g).

36. Defendant SCR is a corporation that is organized under the laws of California with its corporate office located in San Diego, California.

37. Defendant Clearview is also a California corporation with its corporate office located in Anaheim, California.

38. This matter involves a "consumer credit transaction" i.e. a transaction between Ms. Silva and Defendants (or its predecessors), in which property or money was acquired on credit primarily for personal, family, or household purposes. *See* Cal. Civ. Code § 1788.2(e) and 1788.2(f).

39. This case involves money, property or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction. As such, this action arises out of a "consumer debt" and "consumer credit" as those terms are defined by California Civil Code § 1788.2(f).

**FACTUAL ALLEGATIONS**

40. Ms. Silva is a legally blind, Spanish speaking, sixty-year-old retired divorcee.

41. Due to her disability and language barrier, Ms. Silva has difficulty reading and comprehending in the English language.

42. Ms. Silva owns and lives in a modest, single-family home in San Diego, California.

43. In or around October of 2015, Ms. Silva was approached by a sales representative of Sun Coast Remodelers ("Sun Coast"), named Eddie Tecson, at her home.

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

44. Eddie was soliciting "energy efficient" home improvements door-to-door in Ms. Silva's neighborhood. His pitch included the representation that the "energy efficient" home improvements would be provided by a government approved and funded program.

45. At the time, Ms. Silva was not aware of California's PACE financing program nor was she aware of any other "clean energy" program in the State of California.

46. Mr. Tecson explained his company's goal was to assist elderly homeowners procure affordable, energy efficient home improvement renovations. Given the government's support of the program, Mr. Tecson assured Ms. Silva that the government had set aside funds and hired private companies, such as SCR, to handle such energy efficient renovations.

47. Based on SCR's false representations, Ms. Silva was intrigued by what she believed was a government funded program.

48. Nonetheless, due to her being blind, Ms. Silva was still hesitant to commit to drastic home alterations without the assistance her son, Allan.

49. Although Mr. Tecson agreed to not present contracts to Ms. Silva, without Allan's presence, on or around October 23, 2015, Mr. Tecson returned to Ms. Silva's home while she was again alone, and without Allan's support.

50. At this time, Mr. Tecson would not take no for an answer. He pressured Ms. Silva by giving her an ultimatum: he would not return in the future if she did not agree to any of the renovations *that same day*, and Ms. Silva would lose all the benefits the program and the government offered. Distraught by the representative's claims, Ms. Silva felt pressured and compelled to agree with the renovations to her home.

51. After various measurements and an inspection, Mr. Tecson suggested installing modern UV-protective windows, replacing several doors, redoing some of the

stucco, and painting the exterior of her house using a more energy efficient paint.

52. Upon information and belief, Mr. Tecson advised such extensive renovations solely based on an equity search in Ms. Silva's neighborhood, meaning, Mr. Tecson would charge Ms. Silva not on the properties' needs, but on what he believed she could pay based on the equity in her home.

53. While he briefly estimated the price for the unnecessary work would cost $51,789.65, he assured Ms. Silva she could afford this because she would have no monthly bill, she would have help from the government, and manageable costs were simply going to be added to her annual property tax bill.

54. All of Mr. Tecson's representations and negotiations were in Spanish.

55. Mr. Tecson did not explain to Ms. Silva that she would be signing up for a loan, or any financing terms for that matter with Ygrene.

56. Mr. Tecson did not mention Ygrene's name; and he certainly did not explain that Ygrene would obtain a crippling, super priority lien on Ms. Silva's home, whereby the consequences of not paying would result in detrimental consequences such as the foreclosure of her home.

57. As such, Ms. Silva fell victim to Mr. Tecson's high-pressure tactics and misrepresentations and ultimately agreed to the home improvement project.

58. Prior to "signing" the copious documents Mr. Tecson presented, Ms. Silva was never given an opportunity to review the papers, nor could she because the contracts were not in Spanish and Ms. Silva is blind.

59. Still, determined to exploit Ms. Silva, Mr. Tecson guided Ms. Silva's hand as to where to sign. Although she was promised hard copies of all the documents presented to her in six to nine days, they were not given until 18 months later.

60. Several months after SCR's project's completion, in March of 2016, another sales representative, this time, from Clearview approached Ms. Silva at her property, also soliciting energy efficient home improvements.

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

61. The sales representative offered Ms. Silva to install a more energy efficient Heating Ventilation and Air Conditioning ("HVAC") system in her home.

62. At the time, Clearview's agent intruded into Ms. Silva's home, Ms. Silva had a functioning HVAC system.

63. However, the agent insisted she would benefit from a "high efficiency" unit and further encouraged Ms. Silva to accept a new unit because the same company from her previous home improvements would finance the work, so she was already preapproved.

64. Ms. Silva was not aware of the Seasonal Energy Efficiency Ration ("SEER") measure of an HVAC system's energy efficiency, nor did Clearview's agent explain this concept to Ms. Silva.

65. SEER ratings correlate with the energy efficiency of a unit as well as the costs associated with energy production. The higher the rating, the more efficient and less money required to operate.

66. As such, Ms. Silva fell prey to the agent's high-pressure sales tactics and agreed to allow Clearview to replace the HVAC system. The agent did not inform Ms. Silva of her right to rescind this door-to-door contract within three days.

67. After manipulating Ms. Silva into discarding with her already adequate unit, when Clearview eventually replaced Ms. Silva's HVAC system, it did not provide a "high efficiency" unit at all.

68. In fact, the unit installed, a 5-ton 14.5 SEER system, is of the lowest efficiency legally permitted under California and federal law.

69. Indeed, in 2016 when Ms. Silva's HVAC system was installed, the U.S. Department of Energy mandated that all new air conditioners were required to be at least 14 SEER, making this the current baseline for energy efficiency.

70. Despite installing a bottom-shelf unit, Clearview charged Ms. Silva top-shelf prices: $19,999. After five (5) years of paying Ygrene's high-interest and

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

fraudulently obtained loan through tax payments, Ms. Silva will ultimately have to pay Ygrene an unearned sum of $28,160.93. To put into perspective, just months prior, in December of 2015, new furnace and air conditioning units installed in Ms. Silva's home were estimated to cost between $6,200—$7,500.

71. At the completion of the install, Ms. Silva was directed to contact the city to have a certified inspector check if the HVAC was installed properly.

72. To Ms. Silva's dismay, the installation did not pass inspection because 1) the system was missing a "circuit card," 2) the A/C Breaker needed to be labeled as well as the service panel, and 3) because Clearview never installed a ladder to Ms. Silva's attic, the inspector was unable to conduct a full inspection.

73. Despite Ms. Silva's numerous attempts to contact Clearview as well as Ygrene to resolve the installation issues, to this day no one has returned to Ms. Silva's home to properly install the HVAC.

74. Yet, to this day, she is being grossly overcharged for the improperly installed, inadequate unit.

75. Due to the misleading information about how the projects would be financed, Ms. Silva faces an array of financial burdens that she does not understand and cannot afford.

76. In total Ms. Silva's annual property taxes increased approximately $11,000.

77. Unable to make such exorbitant amounts of payments when her only income is fixed alimony, Ms. Silva is currently in nearly $38,000 in arrears on her property taxes.

78. Ms. Silva is threatened with the nearing risk that her home will be foreclosed on and she will be homeless.

79. Ygrene maintains its steep interest rates (8.25% on the SCR and 6.5% on the Clearview remodeling) and administrative fees, all the while securing its priority lien on Ms. Silva's home. Ygrene assesses its fees through taxes,

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

leaving Ms. Silva no option to withhold payment while dispute is pending, since she will then lose her property.

80. Defendants' financing practices are fraudulent and unfair because it baits consumers into purchasing "cheap" clean-energy home improvements and switches this "cheap" purchase to very expensive and burdensome obligations, the consequences of which are unexplained to consumers, and non-payment of which will lead to foreclosure of a home.

81. These practices are further fraudulent and unfair because Defendants promise to deliver "high-efficiency" products but instead deliver the least efficient product allowed in California. Defendants then charge consumers top-shelf prices, as if they had in fact delivered the highest efficient products.

82. Defendants fraudulently acquired a property interest from disabled, non-English speaking individuals by misrepresenting the total cost of home improvements and failing to provide requisite disclosures.

83. Upon information and belief throughout 2018, Defendants have originated hundreds of PACE funding loans that cost more than $20,000 for similarly vulnerable individuals throughout California. Despite the additions to California's Streets and Highway Code; Clean Energy Assessment Contracts prohibiting this conduct[2], Defendants have continued their unlawful practice in 2019.

84. Further, upon information and belief, Ygrene extended credit to consumers under high rate mortgages, as defined by 15 U.S.C. § 1602(aa), based on the

---

[2] Recent legislation has developed to combat and prevent future exploitation of consumers. In 2017, California Governor Jerry Brown signed two bills to better ensure consumer protections for borrowers taking out PACE loans. The bills became effective in 2019. These bills enshrine a number of reforms into law, including a first-time requirement that a borrower's income be factored into underwriting. The legislation also bars kickbacks and establishes a minimum training requirement for contractors, who typically act as salespeople.

consumers' collateral without regard to the consumers' repayment ability, including their current and expected income, current obligations and employment, in violation of 15 U.S.C. § 1639(h).

## FIRST CAUSE OF ACTION

## VIOLATIONS OF THE TRUTH IN LENDING ACT

## 15 U.S.C. § 1601 ET SEQ.

### (Against Defendant Ygrene Only)

Statutory Summary

85. The Truth in Lending Act (TILA) at 15 U.S.C. § 1601 *et. seq*. imposes a series of disclosure requirements on lenders that extend credit to consumers and take a security interest in the consumer's principal residence. The disclosures required under TILA include various terms and costs of the loan, a good faith estimate of finance costs and notice of the right of rescission. Among other things, TILA's purpose is to "assure meaningful disclosure of credit terms and to provide a borrower with the right to rescind a loan for the failure to do so." 15 U.S.C. § 1601(a). TILA at 15 U.S.C §§ 1635 through 1640 provides the consumer with the right to money damages or to rescind "a loan transaction in which a security interest is or will be retained or acquired in the borrower's principal residence." The United States Supreme Court held a borrower's right to rescind a loan transaction for failure to comply with TILA is accomplished by providing notice to the lender of the intent to rescind, given within three years of the date the loan was consummated. *Jesinoski v. Countrywide Home Loans (2015) 135 S. Ct. 790*. This lawsuit arises in part from the failure of the Defendants, and each of them, to comply with TILA.

86. Plaintiff repeats, re-alleges, and incorporates by reference, all allegations of this Complaint as though fully stated herein.

87. Credit is defined as the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment. 15 U.S.C. § 1602(f).

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

88. A "consumer" used with reference to a credit transaction, characterizes the transaction as one in which the party to whom the credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes. 15 U.S.C. §1602(i).

89. Under TILA, interest charges constitute "finance charge[s]." 15 U.S.C. §1605(a).

90. As a business that finances clean-energy or energy-efficient home improvements in exchange for tax assessment payments, Ygrene regularly extends credit to consumers, who assign those funds to a contractor in exchange for performance of "home improvement" work. Ygrene, as with any other traditional loan, assesses finance charges and other fees on top of the principal advanced to the consumer.

91. The only difference between Ygrene's loans and a traditional loan backed by a security interest in the borrower's home is the debtor in Ygrene's case pays the loan back through a special tax assessment as opposed to monthly payments.

92. Ygrene's loans also offer substantially higher interest rates than traditional home equity loans.[3]

93. Ygrene is the party to whom the debt arising from the consumer credit transaction is initially payable. Therefore, Defendant Ygrene is a "creditor" as defined under TILA.

94. A "creditor" also means any person who originates two or more high-cost mortgages in any 12-month period. 15 U.S.C. §1602(g).

---

[3] For reference, as of May 10, 2019, San Diego County Credit Union charges between 5.875% and 6.250% for a home equity loan comparative to the first loan Ms. Silva received from Ygrene at 8.250% interest.

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

95. "High-cost mortgage" means a loan of less than $20,000 which is secured by the consumer's dwelling and for which the total points and fees exceed the lesser of $1,000 or 8% of the total loan amount. 15 U.S.C §1602(bb)(1)(A)(ii).

96. Ms. Silva's debt is a high-cost mortgage transaction because the points and fees associated with Ms. Silva's debt exceed $1,000.

97. Upon information and belief throughout 2017, Defendants have originated hundreds of PACE funding loans that cost more than $20,000 from vulnerable individuals throughout California. Defendants have continued this practice in 2018 and 2019.

98. A "mortgage originator" is any person who, for direct or indirect compensation, (i) takes a residential mortgage loan application; (ii) assists a consumer in obtaining or applying to obtain a residential mortgage loan; or (iii) offers or negotiate terms of a residential mortgage loan. 15 U.S.C. §1602(dd)(2).

99. Under TILA, creditors are prohibited from making a residential mortgage loan unless the creditor makes a reasonable good faith determination based on verified and documented information that, at the time the loan is consummated, the consumer has a reasonable ability to repay the loan according to its terms. 15 U.S.C. 1639c(a)(1).

100. The term "residential mortgage loan" means any consumer credit transaction that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling.

101. Ms. Silva's debts for the installation of UV-protective windows, replacing several doors, redoing some of the stucco, painting the exterior of her house using a more energy efficient paint, and the installation of a new HVAC system are residential mortgage loans because the debts were secured by a tax lien on his dwelling or on residential real property that includes a dwelling. Further,

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
San Diego, CA 92108

although Ms. Silva's PACE financing is paid under the guise of a "tax assessment," the ensuing debts still work like a mortgage on a home, except it provides Ygrene priority over other creditors.

102. A consumer's ability to repay a residential mortgage loan must include consideration of the consumer's credit history, current income, expected income, current obligations, debt-to-income ratio, employment status, and other financial resources other than the consumer's equity in the dwelling or real property that secures repayment of the loan. 15 U.S.C. 1639c(a)(3)

103. A creditor making a residential mortgage loan must verify amounts of income or assets that a creditor relies on to determine repayment ability, including expected income or assets, by reviewing the consumer's W-2 form, tax returns, payroll receipts, financial institution records or other documents that provide reasonably reliable evidence of the consumer's income or assets.

104. Neither Ygrene, SCR, nor Clearview considered Ms. Silva's credit history, income, employment, or debt-to-income ratio in deciding whether to approve his PACE financing. Instead, Defendants relied solely on the value of Ms. Silva's property to approve the PACE financing, knowing full well that Ygrene's priority lien would cover their investment in the case of Ms. Silva's inevitable default or, worse, her untimely death.

105. Ygrene made residential mortgage loans to Ms. Silva without making a reasonable, good faith determination of her ability to pay. Consequently, Defendants violated both TILA, 15 U.S.C. §1639c(a)(1), and TILA's implementing regulation, Regulation Z, 12 C.F.R § 226.34(a)(4).

106. TILA prohibits "mortgage originators from steering any consumer to a residential mortgage loan that the consumer lacks a reasonable ability to repay; or has predatory characteristics or effects." 15 U.S.C. §1639b(c)(3)(A)(i-ii).

107. Defendant Ygrene is a mortgage originator because it received direct compensation for accepting a residential mortgage loan application; assisted a

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

1  consumer in obtaining a residential mortgage loan; and offered the terms of a

2  residential mortgage loan.

3  108. Ms. Silva lacks the reasonable ability to repay Ygrene's financing loan of over

4  $11,000 annually.

5  109. Ygrene did not notify Ms. Silva of her right to rescind in Spanish.

6  110. Further, Ygrene's PACE financing program has predatory characteristics.

7  Defendants specifically solicited PACE financing home improvements to Ms.

8  Silva, a blind Spanish-speaking woman because she owns substantial equity in

9  her home. Therefore, Ygrene violated 15 U.S.C. § 1639b(c)(3).

10  111. As a result of Defendant's multiple violations of TILA, Ms. Silva is entitled to

11  the sum of actual damages, statutory damages under 15 U.S.C. § 1640, costs of

12  this action, and reasonable attorneys' fees. Ms. Silva also reserves his right to

13  rescind the contract pursuant to 15 U.S.C. § 1635(f).

14  **SECOND CAUSE OF ACTION**

15  **VIOLATION OF THE HOME OWNERSHIP EQUITY PROTECTION ACT,**

16  **15 U.S.C. § 1639**

17  **(Against Defendant Ygrene Only)**

18  112. Plaintiff repeats, re-alleges, and incorporates by reference, all allegations of

19  this Complaint as though fully stated herein.

20  113. As mentioned above, Ygrene is a "creditor" under 15 U.S.C. §1602, which also

21  applies to HOEPA provisions.

22  114. The HOEPA requires for each creditor to provide the following disclosures in

23  conspicuous type size:

24

25  • "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application."

26  • "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home and any money you have put into it, if you do not meet your obligations under the loan." 15 U.S.C. §1639(a)(1).

27

28

115. Ygrene failed to provide the requisite HOEPA disclosures to Plaintiff when Ygrene executed the PACE financing agreement. Therefore, Ygrene violated 15 U.S.C. §1639(a)(1).

116. Indeed, despite Ms. Silva's request to have all documents provided to her timely, Ms. Silva did not receive the PACE financing agreements until years after the services.

117. Under HOEPA, creditors shall not engage in a pattern or practice of extending credit to consumers under mortgages based on the consumers' collateral without regard to the consumers' repayment ability, including the consumers' current and expected income, current obligations, and employment. 15 U.S.C. §1639(h).

118. Ygrene did not consider Ms. Silva's income, credit history, employment, and other financial resources when they decided to provide PACE financing to Ms. Silva. Instead, Ygrene based its decision solely on the value of Ms. Silva's property. Therefore, Ygrene violated 15 U.S.C. §1639(h).

119. HOEPA also prohibits creditors from paying a contractor under a home improvement contract from amounts extended as credit under a high-cost mortgage other than in the form of an instrument payable to the consumer and the contractor. 15 U.S.C. §1639(i); 12 C.F.R. 1026.34(a)(1).

120. Ms. Silva acquired PACE financing from Ygrene, for home improvement loans. Ygrene then paid SCR and Clearview directly. Therefore, Ygrene violated 15 U.S.C. §1639(i) (HOEPA) and 12 C.F.R. 1026.34(a)(1) (Regulation Z).

121. HOEPA prohibits creditors from extending mortgages without first receiving a certification from a counselor that is approved by the Secretary of Housing and Urban Development or a State housing finance authority that the consumer has received counseling on the advisability of the mortgage. 15 U.S.C. §1639(u).

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

122. Ygrene did not confirm whether Ms. Silva received the requisite counseling under 15 U.S.C. §1639(u). In fact, Ms. Silva never received such counseling. By extending a mortgage to Ms. Silva without confirming whether they received counseling, Ygrene violated 15 U.S.C. §1639(u).

123. As a result of each and every violation of HOEPA, 15 U.S.C. §1639, Ms. Silva is entitled to the sum of actual damages, statutory damages under 15 U.S.C. §1640, costs of this action, and reasonable attorneys' fees.

**THIRD CAUSE OF ACTION**

**VIOLATIONS OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT**

**CAL. CIV. CODE §§ 1788-1788.32**

**(Against Defendant Ygrene Only)**

124. Plaintiff repeats, re-alleges, and incorporates by reference, all allegations of this Complaint as though fully stated herein.

125. Rosenthal incorporates specific provisions of its federal counterpart, the Fair Debt Collection Practices Act ("FDCPA"). Cal. Civ. Code §1788.17. Specifically, Rosenthal incorporates 15 U.S.C. §1692f, which prohibits a debt collector's use of unfair or unconscionable means to collect or attempt to collect a debt of any amount, "unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

126. Ygrene is attempting to collect nearly twice the amount of Plaintiffs' alleged debt, wherein the consequences of not paying result in Plaintiffs' home being foreclosed.

127. Moreover, despite Ms. Silva's native language, which is known to Ygrene as Spanish, all documents Ygrene provided Ms. Silva with were in English.

128. Here, Ygrene advanced $46,797.00 and $22,099.00 to Ms. Silva. The county's intermediary collection of payments for Ygrene does not absolve Ygrene's liability for violations of the Rosenthal Act.

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

129. Additionally, in the event of a judicial foreclosure, Ms. Silva is personally liable for a deficiency judgment.

130. Ygrene's conduct was unfair and unconscionable, and therefore violated 15 U.S.C. §1692e(2), which is incorporated through Cal. Civ. Code §1788.17.

131. As a result of Ygrene's violation of the Rosenthal Act, Ms. Silva is entitled to any actual damages pursuant to Cal. Civ Code § 1788.30(a); statutory damages in the amount up to $1,000.00 pursuant to Cal. Civ Code § 1788.30(b); and reasonable attorneys' fees and costs pursuant to Cal. Civ Code § 1788.30(c) from Ygrene.

## FOURTH CAUSE OF ACTION
## VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
## CAL. CIV. CODE §§ 1750, *et seq.*

132. Plaintiff repeats, re-alleges, and incorporates by reference, all allegations of this Complaint as though fully stated herein.

133. California Civil Code section 1750, *et seq.*, titled the CLRA, provides a list of "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer." The Legislature's intent in promulgating the CLRA is expressed in Civil Code section in 1760, which provides, *inter alia*, that its terms are to be:

> "Construed liberally and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."

134. Under the CLRA, Ms. Silva is a "consumer" who acquired services for personal, family or household purposes. Cal. Civ. Code §1761(d).

135. Ms. Silva is legally blind and "disabled" as defined in the CLRA. Cal. Civ. Code § 1761(f).

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

136. The home improvement projects that Ms. Silva acquired from Defendants is a "service" within the meaning of Cal. Civ. Code §1761(a).

137. Ygrene chooses what products qualify for financing, purportedly ensures its products are installed in consumers' homes, and developed a platform for which consumers can attain contracting work. All of these "services" were furnished in connection with the sale of the windows, painting, stucco, and HVAC installed in Ms. Silva's home.

138. Upon information and belief, Ygrene's entire sales force are door-to-door contractors, such as SCR and Clearview.

139. Defendant SCR provided Ms. Silva's windows installation, door replacements, stucco correction, and home painting as a "service."

140. Defendant Clearview installed the HVAC system in Ms. Silva's home as a "service" within the meaning of Cal. Civ. Code §1761(b), and the HVAC system itself is a "good" within the meaning of Cal. Civ. Code § 1761(a).

141. The CLRA prohibits "misrepresenting the source, sponsorship, approval, or certification of goods or services" and "misrepresenting the affiliation, connection, or association with, or certification by, another." Cal. Civ Code § 1770(a)(2) – (3).

142. Defendants conned Ms. Silva into accepting overly priced and wholly unnecessary services by representing the city was connected with the program and would be assisting in the funding of Ms. Silva's "energy efficient" home improvements. This was not true.

143. Defendants engaged in a myriad of lies in an effort to procure Ms. Silva's business.

144. The CLRA also prohibits "misrepresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status,

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

1    affiliation or connection in which he or she does not have." Cal. Civ. Code

2    §1770(a)(5).

3    145. Defendants violated the CLRA because they misrepresented the quality and

4    benefits Ms. Silva would receive from the home improvement services. Ms.

5    Silva has not saved money, but instead has become indebted for the rest of her

6    life for home improvements she did not need and could not afford.

7    146. It is difficult to fathom the energy efficiency attained from interior door

8    installations. Similarly, the "energy efficient" windows, stucco, and paint being

9    pitched and the workmanship of the installation are of questionable quality and

10   benefit.

11   147. Clearview represented to Ms. Silva that it would install a "high efficiency"

12   HVAC unit in Ms. Silva's home. However, instead of a high-efficiency unit,

13   Ygrene approved and Clearview installed one of the most inexpensive (to

14   Defendants) and least efficient units permitted by law. Consequently,

15   Defendants violated Cal. Civ. Code § 1779(a)(5) and (a)(9).

16   148. Defendants also represented to Ms. Silva that it provides these services under a

17   "government program." This misrepresented to Ms. Silva that the

18   goods/services provided, process of obtaining financing, source of payment,

19   and/or other particulars of the contract would be provided for or, at the very

20   least, were regulated by the government.

21   149. This, however, is not the case, as the only thing the "government program"

22   provides is a special tax assessment district by which predatory lenders such as

23   Defendants believe they can skirt consumer protection laws and obtain super

24   priority liens on unsuspecting disabled persons' homes. Consequently,

25   Defendants violated Cal. Civ. Code § 1770(a)(2) and (a)(3).

26   150. The CLRA prohibits "representing that a part, replacement, or repair service is

27   needed when it is not." Cal. Civ. Code § 1779(a)(15).

28

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

151. SCR represented to Ms. Silva that she needed to extensive home improvements to become more energy efficient. There is no evidence that the work done made Ms. Silva's home more energy efficient. Further, SCR did not make any assessment of the energy efficiency of Ms. Silva's home at the time it made such representations. Consequently, SCR violated Cal. Civ. Code § 1770(a)(15).

152. Ms. Silva is not a sophisticated expert about PACE funding programs or energy-efficient home improvements, and she acted reasonably when she "agreed" to Defendants' services based on Ms. Silva's beliefs that Defendants' representations were true and lawful.

153. Defendants manipulated Ms. Silva into procuring unnecessary and unaffordable services, so that Ygrene could gain priority liens over Plaintiffs' property and SCR and Clearview could receive exorbitant amounts.

154. Defendants' conduct violated the CLRA.

**FIFTH CAUSE OF ACTION**

**VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE § 17200, *et seq.***

155. Plaintiff repeats, re-alleges, and incorporates by reference, all allegations of this Complaint as though fully stated herein.

156. Plaintiff and Defendants are each "person[s]" as defined by California Business & Professions Code § 17201. California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

157. "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," three of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, and (3) a "fraudulent" business act or practice." The

definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

### A. *"Unlawful" Prong*

158. Defendants violated TILA, HOEPA, and the CLRA in addition to committing fraud. These extensive and substantial statutory and common law violations evidence Defendants' unlawfulness within the meaning of the UCL.

159. Defendants had other reasonably available alternatives to further its business interests, other than the unlawful conduct described herein, such as falsely representing the performance of services.

160. Instead Defendants deliberately extended credit to Ms. Silva without confirming whether or not Ms. Silva had the ability to make payments.

161. Ms. Silva reserves the right to allege other violations of law, which constitute additional unlawful business practices or acts, as such conduct is ongoing and continues to this date.

### B. *"Unfair" Prong*

162. Defendants' actions and representations constitute an "unfair" business act or practice under Business & Professions Code §17200, *et seq*. in that Defendants' conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct. Without limitation, it is an unfair business act or practice for Defendants to knowingly or negligently represent to the consuming public that they offer quality products funded by the City of San Diego and force consumers to become indebted for the remainder of their lives or lose their homes to pay off minor home improvements.

163. Further Defendants hire contractors to communicate with consumers in Spanish, only to provide non-legible English documents on electronic devices to blind Spanish-speaking individuals.

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

164. Such conduct by Defendants is "unfair" because it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers in that consumers are led to believe that Defendants are providing a benefit to consumers. Instead, Defendants manipulate consumers into disregarding their rights and attaching property liens on elderly, non-English speaking peoples' homes.

165. Ms. Silva could not have reasonably avoided the injuries she suffered. Indeed, until she received her taxes the years following the services, Ms. Silva was not aware of Defendants' ongoing and exploitative conduct. Ms. Silva reserve the right to allege further conduct that constitutes other unfair business acts or practices.  Such conduct is ongoing and continues to this date, as Defendants continue to mislead the public and attach over $11,000 in annual charges to Ms. Silva's taxes.

### C. *"Fraudulent" Prong*

166. Plaintiff reserves the right to allege further conduct that constitutes other fraudulent business acts or practices.  Such conduct is ongoing and continues to this date.

167. Defendants' fraudulent, unlawful and unfair business practices, as described above, presents an ongoing threat to consumers because consumers will continue to be misled by the services Defendants offer on their websites and through door-to-door solicitations.

168. Defendants engaged in fraudulent and deceptive business practices that mislead the public. They deliberately deceived Ms. Silva by representing that Defendants were affiliated with the city/and or the city would pay for the services, promising high efficiency home improvements and in turn providing the lowest efficiency products legally permitted, presenting limited documentation to Ms. Silva in a language other than her primary language, and overcharging interest payments.

169. Ms. Silva has suffered injury in fact, has lost money and continues to lose money, and risks having her home being foreclosed as a result of Defendants' unfair competition, as more fully set forth herein. Ms. Silva has been injured as she relied on Defendants' misrepresentations.

170. Defendants, through their acts of unfair competition, have unfairly acquired a priority secured interest in Ms. Silva's home. Ms. Silva requests this Court rescind the parties' contract, and remove the lien on Ms. Silva's home, for Defendants' violations of the California Business & Professions Code § 17200, *et seq*., as discussed herein.

171. Ms. Silva further seeks an order requiring Defendants to make full restitution of all monies wrongfully obtained and disgorge all ill-gotten revenues and/or profits, together with interest thereupon.

**SIXTH CAUSE OF ACTION**

**FRAUD**

172. Plaintiffs repeat, re-allege, and incorporate by reference, all allegations of this Complaint as though fully stated herein.

173. In California, fraud exists when there is (a) misrepresentation; (b) knowledge of falsity; (c) intent to defraud or induce reliance; (d) justifiable reliance; and (e) resulting damage. *Engalla v. Permanente Medical Group*, 15 Cal.4th 951, 974 (1997).

174. Defendants worked together to take advantage of Ms. Silva. On multiple occasions they came to Ms. Silva's home, waited until Ms. Silva was alone and most vulnerable. They then represented Ms. Silva needed energy efficient home improvements when she did not and that the city would pay for a portion of the costs of the home improvements when they would not.

175. Defendants further defrauded Ms. Silva through misrepresentations regarding the efficiency and necessity of the installed HVAC system.

176. Defendants worked together to defraud Ms. Silva. SCR and Clearview used misrepresentations and concealments to coerce Ms. Silva into an agreements, and Ygrene compounded the fraud by obtaining a priority lien on Ms. Silva's property that she is incapable of paying.

177. Ms. Silva relied on Defendants' representations that the City would pay for a portion of the costs of the home improvements, that Ms. Silva would ultimately save money, and the remodeling was necessary for energy efficiency. As a result, Ms. Silva has and continues to lose money, and her ability to sell her house has been hindered as there is a priority tax lien attached to the property. Ms. Silva now suffers emotional distress.

178. Ms. Silva is entitled to compensatory damages, restitutionary relief, and punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that judgment be entered against Defendants, and Plaintiff be awarded damages from Defendants, as follows:

**FIRST CAUSE OF ACTION**

**VIOLATIONS OF THE TRUTH IN LENDING ACT**

**15 U.S.C. § 1601 *et seq.***

**(Against Defendant Ygrene)**

- An award for actual damages pursuant to 15 U.S.C. §1640(a)(1);
- An award for an amount equal to the sum of all finance charges and fees paid by Plaintiff pursuant to 15 U.S.C. §1640(a)(4);
- An award for attorney's fees and costs pursuant to 15 U.S.C. §1640(a)(3);
- Treble damages pursuant to Cal. Civ. Code § 3345; and
- Any other relief this Court should deem just and proper.

///

///

///

## SECOND CAUSE OF ACTION

## VIOLATION OF THE HOMEOWNERSHIP EQUITY

## 15 U.S.C. § 1639

## (Against Defendant Ygrene)

- An award for actual damages pursuant to 15 U.S.C. §1640(a)(1);
- An award for attorney's fees and costs pursuant to 15 U.S.C. §1640(a)(3);
- Treble damages pursuant to Cal. Civ. Code § 3345; and
- Any other relief this Court should deem just and proper.

## THIRD CAUSE OF ACTION

## ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT CAL. CIV.

## CODE §§ 1788-1788.32

## (Against Defendant Ygrene)

- An award of actual damages pursuant to California Civil Code § 1788.30(a);
- An award of statutory damages of $1,000.00 pursuant to Cal. Civ. Code § 1788.30(b);
- An award of costs of litigation and reasonable attorney's fees, pursuant to Cal. Civ. Code § 1788.30(c);
- Treble damages pursuant to Cal. Civ. Code § 3345; and
- Any other relief this Court should deem just and proper.

## FOURTH CAUSE OF ACTION

## VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT

## CAL. CIV. CODE § 1750, *et seq.*

- Actual damages, injunctive relief, restitution, and punitive damages pursuant to Cal. Civ. Code § 1780(a)[4];

---

[4] Pursuant to Cal. Civ. Code § 1782, Ms. Silva sent a CLRA letter requesting that Defendants cure their conduct. Defendants were given the requisite period to cure under the CLRA, but have failed to do so.

KAZEROUNI LAW GROUP, APC
2121 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

KAZEROUNI LAW GROUP, APC
2221 CAMINO DEL RIO SOUTH, SUITE 101
SAN DIEGO, CA 92108

- An award of costs and attorney's fees pursuant to Cal. Civ. Code § 1780(e); and

- Any and all relief that this Court deems necessary or appropriate.

## FIFTH CAUSE OF ACTION

## CALIFORNIA'S UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE § 17200, *et seq.*

- An award for restitutionary relief in the form of disgorgement of profits under Cal. Bus. and Prof. Code §17203 ("any money. . . which may have been acquired by means of such unfair competition").

- Exemplary and/or punitive damages for intentional misrepresentations pursuant to, *inter alia*, Cal. Civ. Code § 3294;

- Injunctive Relief under Cal. Bus. and Prof. Code §17203;

- Any other relief this Court should deem just and proper.

## SEVENTH CAUSE OF ACTION

## FRAUD

- An award of actual damages, statutory damages, punitive, or treble damages, and other proper relief as provided by law;

- Equitable relief in the form of an injunction prohibiting the Defendants' conduct described herein;

- The costs of bringing this suit, including reasonable attorneys' fees; and

- Treble damages pursuant to Cal. Civ. Code § 3345; and

- Any other relief this Court should deem just and proper.

## TRIAL BY JURY

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

///

///

///

1

Date: December 4, 2019                    **Kazerouni Law Group, APC**

2

3                                         By: /s/ Yana A. Hart

4                                              Yana A. Hart, Esq.
                                               Email: yana@kazlg.com
5                                              Attorneys for Plaintiff

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KAZEROUNI LAW GROUP, APC**
**2221 CAMINO DEL RIO SOUTH, SUITE 101**
**SAN DIEGO, CA 92108**